# COURT OF APPEALS OF VIRGINIA

## Record No. 0235-25-4

JORDAN EUGENE COCHRAN

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Lorish, Callins and White

Argued at Alexandria, Virginia

Opinion Issued July 21, 2026[*]

**FROM THE CIRCUIT COURT OF FAIRFAX COUNTY**
David Bernhard, Judge[1]

Mark S. Thrash for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,[2] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE KIMBERLEY SLAYTON WHITE

This appeal arises from the trial court's denial of Jordan Eugene Cochran's motions to sever charges, suppress statements, and exclude potentially prejudicial evidence following two shootings that occurred minutes apart and in close geographic proximity in Fairfax County. After a jury trial, Cochran was convicted of first-degree murder, robbery, aggravated malicious wounding, and related firearm offenses. He now challenges the trial court's rulings on joinder,

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable David Bernhard presided over the proceedings below. Now a member of this Court, Judge Bernhard took no part in this decision.

[2] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

the admissibility of his statements, the admission of a 911 call, and the sufficiency of the evidence establishing malice. For the reasons below, we affirm the trial court's judgment.

BACKGROUND

"On appeal, this Court 'consider[s] the evidence and all reasonable inferences flowing from that evidence in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Pooler v. Commonwealth*, 71 Va. App. 214, 218 (2019) (alteration in original) (quoting *Williams v. Commonwealth*, 49 Va. App. 439, 442 (2007) (en banc)).

I. Shootings, Arrest, and Charges

On January 8, 2022, the appellant, Jordan Eugene Cochran, got into an altercation with his friend and victim, Kebbren Leigh-Gaye, resulting in Cochran shooting him at a bus stop in Fairfax County. Leigh-Gaye was declared deceased at the hospital later that evening. Shortly after the Leigh-Gaye shooting, Cochran shot Reggie Grant at a nearby 7-Eleven when Grant refused to give Cochran a ride. Grant survived the shooting but lost the use of his right eye. Based on these events, Cochran was convicted of first-degree murder, robbery, aggravated malicious wounding, and two counts of use of a firearm in the commission of a felony.

Earlier on the day of the shootings, Cochran had called his friend, Daxtyn Tran, whom he had known for several years, asking him to help change his flat tire. When Tran arrived to help Cochran fix his flat tire, he saw Leigh-Gaye with him. After some time, however, Tran decided to leave the bus stop and refused to help fix the tire because Cochran seemed "aggravated and difficult." Soon after, before the physical altercation that resulted in the first shooting, Leigh-Gaye called Tran to pick him up from the bus stop because he had felt threatened when Cochran pointed his firearm at him, but Tran refused.

According to his own testimony, Cochran became agitated because Leigh-Gaye had lost one of Cochran's AirPods and Leigh-Gaye refused to give back the red shoes that Cochran had

loaned him. Witness Pablo Gonzalez said that the two men were yelling and pushing each other in the middle of the street. As the confrontation over the red shoes became more heated, Leigh-Gaye grabbed Cochran from behind and reached for Cochran's gun but failed to find it. Shortly thereafter, Gonzalez heard a loud banging sound, and when he turned around, saw Leigh-Gaye hitting Cochran "in the head and all over." During the physical altercation, Cochran told Leigh-Gaye to stop numerous times. Nevertheless, Leigh-Gaye grabbed Cochran by his hoodie and repeatedly slammed his head against the bus stop bench.

After the altercation, Leigh-Gaye walked a few feet away from the bus stop, and Cochran pulled out a gun and confronted him. Cochran claims that, standing about three or four feet from Leigh-Gaye, he felt "fearful" and that he was "in a flight or fight situation." He asked Leigh-Gaye to take off the red shoes and return them to him. Cochran testified that Leigh-Gaye told him that he only feared God and then charged at him, leading Cochran to shoot him. Though Cochran denies it, Gonzalez saw Cochran point his gun at Leigh-Gaye and testified that Leigh-Gaye only turned and began approaching Cochran after the gun was pointed at him.

Gonzalez heard Leigh-Gaye sarcastically tell Cochran, "What are you going to do, shot [sic] me? Go for it." He then saw Cochran shoot Leigh-Gaye and walk across the street. During this time, Leigh-Gaye called 911, told them his location, and informed them several times that he had been shot and was dying. Soon after, Gonzalez saw Cochran return to the bus stop and tell Leigh-Gaye, "I told you I was going to do it." He then removed and took the red shoes from Leigh-Gaye, as well as Leigh-Gaye's wallet and phone. While Gonzalez was attempting to call 911, a Fairfax police officer arrived, and Gonzalez informed him that Cochran was heading toward the 7-Eleven.

Cochran stated that after the shooting he did not call 911 because he felt "just so panicked." Instead, he called and asked Tran to pick him up, explaining that he had killed Leigh-Gaye, but Tran declined. Cochran then walked to a nearby 7-Eleven.

When Cochran arrived at the 7-Eleven, he began approaching cars asking passengers for rides. He eventually stopped to ask Rana Hillary, who was sitting in the driver's seat of her car while her fiancé, Reggie Grant, was inside the store. Hillary rolled down her window, asking how she could help Cochran. He responded in an "aggressive" tone, "Bitch[,] I need a ride." Hillary declined to offer him a ride. Once Grant exited the store, he approached Cochran and asked, "What the F are you doing by my car?" Cochran replied, explaining, "I told your bitch I need a ride." Cochran then offered them money for a ride, but they declined. Cochran asked whether they had a gun in the car, and Hillary told him they did not.

Nevertheless, when Hillary put the car in reverse to back out of her parking spot, Cochran said that he believed Grant was reaching for a firearm in the passenger seat, so he shot through their front window, hitting Grant in the face. Hillary testified that there was glass everywhere and that blood was gushing from Grant's face, so she drove to a nearby Denny's restaurant where other witnesses called 911. Grant survived the shooting but was blinded by the gunshot in his right eye. Later, the Department of Forensic Science analyzed the cartridge cases from Cochran's firearm and the bullets recovered from both shootings, finding a match between them "based on corresponding class and individual characteristics." Fairfax County Officer Kyle Albert saw Cochran after the 7-Eleven shooting walking in the nearby Taco Bell parking lot, and an arrest team came and took Cochran into custody.

After Cochran had spent some time at the Mount Vernon police station, Fairfax County Officers Spencer Laitinen and Adkins transported him to the Fairfax County Adult Detention Center. As Officer Adkins placed Cochran into the patrol cruiser, he began flirting with her,

asking what she would "rate [him] on a scale of 1 to 10[.]" Officer Adkins told him, "What would I rate you? Well, you just murdered someone." Cochran then yelled back, "Two people! Two people! You hear me! Two. Two!"

Sometime later, Cochran began rapping in the car about the shootings. He also said, "I've been geeking to click that joint all day and I finally killed somebody. These are my first two bodies, y'all. I didn't wanna do it," and said he needed a friend to talk to. After unrelated conversation on other topics, Cochran said that he "had to put down [his] right-hand man" and that he "just spanked two [n-words]." He went on, "[n-word] try to push it up on me. That's what they wanted . . . . They died. One of the [n-words] a vegetable, one of the [n-words] dead. But the [n-word] that died is like my right-hand man so that's fucked up." He then said, "He got shot once, so I had to crush him, bruh. He got shot once. He was showing no signs of fear, bruh. I told him I was gunna strike him . . . , so I striked him. The fuck. I'm getting away with my murder case. Fuck."

Following his statements, Cochran asked Officer Adkins where they were going. She told him that he was "going to the big jail," so he should "find a friend there." Cochran told officers that he had COVID-19 and "was going to isolation." He then asked Officer Adkins how long he could stay in isolation and discussed other COVID-19 procedures. Afterwards, officers ignored his attempts to continue talking with them. Despite officers not responding to him, Cochran continued to discuss the crimes, telling officers that he had told Leigh-Gaye he was going to shoot him and that he had to do it because Leigh-Gaye showed no fear.

Before arriving at the Fairfax County Adult Detention Center, Cochran asked Officer Adkins if she could tell if he was "uneasy." She told him that "I think you're figuring out where

you're gonna be for awhile."[3] Cochran said he wanted to go home and followed up by telling her that "I got two murders on me now, basically, bro. I'm just waiting for another [n-word] to die. For what? To say I'm hard . . . ?" Throughout the car ride, Cochran continued to talk, but officers ignored him. Cochran asked why they were not talking to him, and Officer Adkins told him that it was difficult to hear him. Officer Laitinen never spoke to Cochran nor responded to any of his questions.

Cochran spent some time at the Adult Detention Center and then was taken by Fairfax County Detective Leah Smith before the magistrate. Detectives Smith and Byerson did not advise Cochran of his *Miranda* rights because he had already invoked his right to have his lawyer present.[4] The magistrate put Cochran under oath and told him that "she could hear from him if there was anything that he would want to say, he didn't have to say anything, and that the officers would be in the presence there if he did say anything."

Cochran claimed he acted in self-defense, admitted to taking Leigh-Gaye's phone, but denied he robbed him. When Cochran started speaking, Detective Smith asked Detective Byerson to take notes while she recorded Cochran with her phone. Neither Detective Smith nor Detective Byerson asked Cochran any questions, but Detective Byerson said, "[t]here's always another side to every story," and that he would listen to anything Cochran had to say.

At one point the magistrate walked away to do paperwork, and Cochran continued speaking to the detectives. He made several incriminating statements over the course of almost an hour, but Detective Byerson repeatedly discouraged Cochran from continuing to talk about the case. He said, "I think you should probably talk to your attorney. That's what you said you

---

[3] Counsel for both sides misquote this line in the record, reporting that Officer Adkins told Cochran, "I think you're *finding* out where you're going to be for a while." (Emphasis added).

[4] *See Miranda v. Arizona*, 384 U.S. 436, 469, 471 (1966).

wanted to do." After Cochran continued to discuss the case, Detective Byerson reminded Cochran that he was being recorded and encouraged him to talk about something other than the case. Cochran responded, "I don't want to be incriminated right now, but I'm talking to you guys because I fuck with you."

Cochran said he wanted to go home, and the detective said, "I just want to make sure you understand that you're not going to go home tonight." As Cochran continued to incriminate himself, Detective Byerson said, "I just want to make sure you remember that you asked for an attorney, so that's the way I'm going to treat it, so I just want to make sure I'm reminding you of that" and again encouraged him to talk about other topics. Ultimately, Cochran told the detectives that he prayed before, during, and after he "killed th[at] [n-word]." He also told officers they were "face to face with a killer" and needed to "tread lightly, I just killed two [n-words]."

Once the magistrate returned and read the charges, Cochran stated several times that he pleaded "[n]o contest." The magistrate charged him with first-degree murder, robbery, malicious wounding, and two counts of using a firearm in the commission of a felony. The magistrate then conducted a bail hearing, during which Cochran made incriminating statements without being asked to discuss his case.

The Fairfax County Circuit Court indicted Cochran on charges of first-degree murder, aggravated malicious wounding, two counts of using a firearm in the commission of a felony, and robbery resulting in death.

## II. Pre-Trial Rulings

Before trial, Cochran argued that the trial court should sever the charges related to Leigh-Gaye, including first-degree murder, robbery, malicious wounding, and firearm charges from the malicious wounding and firearm charges related to Reggie Grant. He argued that the

two sets of charges arose from separate incidents and were not "the same act or transaction," "connected," nor "part of a common scheme or plan." The trial court, however, rejected Cochran's argument and tried both offenses together.

At the hearing, Cochran also argued that the statements he made to Officer Adkins should be suppressed because they violated his Fifth Amendment right against self-incrimination. He asserted that her remarks, including, "Well, you just murdered someone," that he was "going to the big jail," and that he was "figuring out where [he was] going to be for a while," were "reasonably likely to elicit an incriminating response from the suspect."

The trial court found that Officer Adkins's statement, "[w]ell, you just murdered someone," was admissible and did not violate his Fifth Amendment rights because it was not the byproduct of a police interrogation. Instead, the trial court found that Officer Adkins was "startled" by Cochran flirting with her considering that he had just been arrested for murder and at no point was she trying to interrogate him since she slammed the patrol cruiser door shut after she made the statement. While the trial court never specifically ruled on Officer Adkins's statements that Cochran was "going to the big jail" and that he was "figuring out where [he was] going to be for a while," the trial court rejected the defense's motion to suppress those statements.

The trial court also rejected Cochran's motion to suppress the statements made to the magistrate, finding that they did not violate his *Miranda* rights. Cochran asserted that because he was not represented by counsel, was placed under oath, and was not advised of his *Miranda* rights, the circumstances created the "impression" that his statements would not be used against him in trial court. He also argued that the incriminating statements made to the magistrate should be suppressed because Detectives Smith and Byerson failed to inform the magistrate that he had invoked his right to counsel. However, the trial court found that there was no "common

investigative design between the magistrate and the police" that indicated the police had in advance requested the magistrate to ask specific questions about the alleged crimes.

The trial court also found no evidence that the magistrate asked Cochran specific questions regarding the alleged offenses. Rather, the magistrate only asked whether he wished to tell her anything about what had happened, while informing him that he was not required to do so. Thus, according to the trial court, *Miranda* did not apply regardless of whether Cochran invoked his right to counsel, and the police did not have to inform the magistrate of Cochran invoking his right to counsel. As a result, the trial court denied Cochran's motion to suppress the incriminating statements he made to the magistrate.

Lastly, the trial court denied Cochran's motion to exclude Leigh-Gaye's 911 call, finding that the call did not unfairly prejudice him. At the hearing, Cochran argued that playing the 911 call unfairly prejudiced him because Leigh-Gaye's tone during the call sounded like a "death agony," which could cause the jury to convict him based on emotion rather than the evidence. He believed that the prejudicial effect of admitting the 911 call outweighed its probative value because Leigh-Gaye did not state who had shot him. Additionally, he argued that the 911 call was cumulative because other evidence established Cochran's shooting of Leigh-Gaye. For instance, Pablo Gonzalez testified that he witnessed the fight, the shooting, and Cochran returning to the scene to retrieve his phone and the red shoes. Thus, because the call sounded like a "death agony" and was merely cumulative, Cochran contended that its prejudicial effect outweighed its probative value under Virginia Rule of Evidence 2:403(a). The trial court denied his motion because it found that the 911 call provided additional evidence, such as the location of the shooting, and that its probative value was not outweighed by its prejudicial effect.

### III. Trial Court's Rulings[5]

The case proceeded to a jury trial. On the second day of Cochran's trial, the court received a media request for Exhibit 11, the video of Cochran in the back of the police car as he was transported from the police station to the jail. Cochran objected, arguing that the release to the public would cast him in a negative light, which could jeopardize his right to a fair trial. The trial court ruled that, because the jury had already seen the video and Virginia law required the court to provide records to the public upon request, release of the video was proper. The trial court also informed the jury that there would be a news report on television about the case, so they should not watch it. Hence, the trial court found that the release of the video to the media would not jeopardize Cochran's right to receive a fair trial.

Once the video was played on the news, Cochran later argued that the reporter's characterization of him as "boastful" about committing the crimes could prejudice his right to a fair trial. The trial court asked the jury whether they had been exposed to outside news reports regarding the case, and the jurors indicated that they had not. Cochran argued that at least one juror failed to respond to the trial court's question. Once again, the trial court warned jurors not to watch or read any reports related to the case.

When a second news report was released to the public, Cochran filed a motion for a mistrial on the grounds that it mischaracterized the altercation between him and Leigh-Gaye and was designed to pull at the viewers' heartstrings. The news report showed the same footage of Cochran in the police car along with images of Leigh-Gaye in his graduation robe with his father, in his football uniform, and in a suit receiving a football trophy. Cochran again asserted

---

[5] Cochran testified on his own behalf at trial. Consistent with our duty to view the evidence in the light most favorable to the Commonwealth, we incorporate the portions of his testimony relevant to this appeal into our recitation of the events of January 8, 2022. (*See supra* BACKGROUND, Section I at 2-5).

- 10 -

that the reporter's comment referring to him as "boastful" about committing the crimes and the video of him in the police car prejudiced his right to a fair trial. Defense counsel argued that a specific news story's "[g]enerating this much sympathy for the decedent in combination with the video of [Cochran] in the back of the car and the commentator on the news program . . . stating that my client was bragging about it" rendered the impact of the video's release "over the top." Thus, Cochran argued that the trial court should grant his motion for a mistrial.

The trial court rejected the motion because it had provided the jury with a "cautionary instruction" to disregard anything they had heard from outside media, and there was no evidence that the jury had disobeyed its instruction. The trial court further explained that even if the jury ignored its instruction, it had heard all the evidence and was required to decide the case based on the evidence presented at trial, not on information from the media. As a result, the trial court denied Cochran's motion for a mistrial, concluding that there was no evidence that his right to receive a fair trial had been prejudiced.

After the Commonwealth rested, Cochran moved to strike the first-degree murder charge, arguing that the evidence established only voluntary manslaughter. He contended that the Commonwealth failed to prove malice because he had acted in the heat of passion when he shot Leigh-Gaye. According to Cochran, the evidence showed that Leigh-Gaye beat him, walked away, and then returned, daring him to shoot. Cochran asserted that he shot Leigh-Gaye out of fear and without time for reflection, which negated the element of malice and should have limited his offense to voluntary manslaughter. The trial court denied the motion, finding that whether Cochran acted in the heat of passion or had sufficient time to cool off between the altercation and the shooting was a question for the jury.

After the jury reached its verdict, Cochran was convicted of first-degree murder, robbery, aggravated malicious wounding, and two counts of use of a firearm in the commission of a

felony. He was sentenced to two life terms plus eleven years of incarceration with no time suspended. Cochran now appeals the denial of his motions to this Court.

ANALYSIS

I. Motion to Sever

"Whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court. Thus, a trial court's ruling on the matter will not be reversed absent a showing that the trial court abused its discretion." *Traish v. Commonwealth*, 36 Va. App. 114, 129 (2001) (quoting *Ferrell v. Commonwealth*, 11 Va. App. 380. 386 (1990)). Under the abuse of discretion standard, a "trial judge's 'ruling will not be reversed simply because an appellate court disagrees.'" *Thomas v. Commonwealth*, 44 Va. App. 741, 753 (2005) (quoting Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L.J. 747, 754 (1982)). Instead, "[o]nly when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006). Moreover, when "reviewing a trial court's pretrial ruling allowing joinder of offenses for trial, the appellate court is not confined to the contents of the pretrial proffers and may rely on evidence presented at trial to affirm the joinder decision." *Holloman v. Commonwealth*, 65 Va. App. 147, 158 (2015).

According to Rule 3A:10(c), trial "court[s] may direct that an accused be tried at one time for all offenses then pending against him, if justice does not require separate trials and (i) the offenses meet the requirements of Rule 3A:6(b) or (ii) the accused and the Commonwealth's attorney consent thereto." Rule 3A:10(c). Hence, it provides "the 'trial court [with] limited discretion to order an accused to be tried for more than one offense at the same time.'" *Purvis v. Commonwealth*, 31 Va. App. 298, 304 (2000) (alteration in original) (quoting *Godwin v. Commonwealth*, 6 Va. App. 118, 121 (1988)).

However, as in this case, when the accused does not consent to having the charges tried together, the trial court is prohibited from "try[ing] them together unless the offenses [meet] the criteria of Rule 3A:6(b) and justice [does] not require separate trials." *Godwin*, 6 Va. App. at 121. Trial courts must consider the fairness of admitting evidence of other offenses because "[t]he purpose of Rule 3A:10(c) is to strike a balance between judicial economy and the danger of unfair prejudice." *Cousett v. Commonwealth*, 71 Va. App. 49, 60 (2019). In many instances, "[j]ustice often requires separate trials where highly prejudicial evidence of one of the crimes is not admissible in the trial of the other." *Brooks v. Commonwealth*, 73 Va. App. 133, 145 (2021) (quoting *Long v. Commonwealth*, 20 Va. App. 223, 226 (1995)).

But there are "[e]xceptions to this rule [that] allow evidence of other offenses where the evidence 'tends to prove any relevant element of the offense charged.'" *Brown v. Commonwealth*, 37 Va. App. 507, 516 (2002) (quoting *Cheng v. Commonwealth*, 240 Va. 26, 33 (1990)). Additionally, we have found that evidence of a separate crime is admissible "where the motive, intent or knowledge of the accused is involved, or where the evidence is connected with or leads up to the offense for which the accused is on trial." *Id.*

To satisfy Rule 3A:6(b)'s requirements, the "[o]ffenses may be joined if (1) the offenses are based on 'the same act or transaction,' (2) the offenses are based on 'two or more acts or transactions that are connected,' or (3) the offenses 'constitute parts of a common scheme or plan.'" *Cook v. Commonwealth*, 7 Va. App. 225, 228 (1988); Rule 3A:6(b).

Cochran argues the trial court erred because his offenses were not part of "the same act or transaction," "connected," nor had a "common scheme or plan." He also argues that the interest of justice requires separate trials because admitting evidence that Cochran shot Grant at the 7-Eleven could lead the jury to convict him of first-degree murder for shooting Leigh-Gaye, rather than voluntary manslaughter. However, we disagree and conclude that the offenses were

connected and that justice did not require separate trials. Thus, the trial court did not abuse its discretion in denying Cochran's motion to sever.

When examining whether two acts or transactions are connected, "[a] reviewing court must look to whether the transactions were 'closely connected in time, place, and means of commission, all of which supports the use of a single trial.'" *Yellardy v. Commonwealth*, 38 Va. App. 19, 24 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 229 (1992)). "To meet the 'connected' test, the crimes should be 'so intimately connected and blended with the main facts adduced in evidence, that they cannot be departed from with propriety.'" *Id.* (quoting *Spence v. Commonwealth*, 12 Va. App. 1040, 1044 (1991)). However, the connected test will not be satisfied if Cochran's crimes "'occur[ed] on different days, at different places, and no evidence link[s] or connect[s]' one offense with the other." *Purvis*, 31 Va. App. at 305-06 (second and third alterations in original) (quoting *Godwin*, 6 Va. App. at 122). Precedent supports our conclusion that Cochran's offenses were connected.

Shortly after shooting Leigh-Gaye, Cochran returned to the scene and removed the red shoes and Leigh-Gaye's phone and wallet. He then, wearing the red shoes, walked to a nearby 7-Eleven, where he demanded that Hillary give him a ride, leading to an altercation and the shooting of Grant. As the evidence at trial showed, Cochran attempted to flee immediately after the first shooting by asking Tran for a ride and then walked to the 7-Eleven, where he demanded a ride from Hillary. Soon after the second shooting, Cochran was arrested in a Taco Bell parking lot. Cochran also discussed both shootings with the magistrate, further indicating that both events are connected. Moreover, ballistics evidence tied the two shootings together. Thus, "[t]he offenses charged against the defendant arose out of a series of related and connected events." *Fincher v. Commonwealth*, 212 Va. 552, 553 (1972). They were also "similar offenses committed by the same person[], one immediately after the other, in close geographical

- 14 -

proximity to each other." *Cook*, 7 Va. App. at 229.[6] Accordingly, we find "[t]hey were connected by time, place, method and perpetrators." *Id.* Therefore, Rule 3A:6(b) is satisfied.

We also conclude that the interest of justice does not require separate trials because the evidence is interconnected, and much of it would have been admissible in separate trials to identify Cochran and to show his motive in the other.

As stated earlier, an exception to admitting evidence from a separate crime is "where the evidence is connected with or leads up to the offense for which the accused is on trial." *Brown*, 37 Va. App. at 516. After Cochran had shot Leigh-Gaye and robbed him, he went to the 7-Eleven to demand that Hillary give him a ride, which led to the shooting of Grant. Thus, the evidence of the first shooting led directly to the second.

Witness and expert testimony further connected the two incidents by identifying Cochran's motive for committing the crimes. In past cases, we have found that "Virginia Rule of Evidence 2:404 explicitly allows evidence of other crimes, wrongs, or acts if its probative value outweighs its incidental prejudice" and a fact relevant to the offense charged, such as the defendant's identity or motive. *Brooks*, 73 Va. App. at 147; *see* Va. R. Evid. 2:404.

Here, Pablo Gonzalez observed Cochran removing the red shoes from Leigh-Gaye, and both Hillary and Grant stated that Cochran approached them while holding red shoes. As a result, these witnesses could testify to establish Cochran's identity because they could describe his appearance and the fact that he was holding red shoes. Additionally, when Cochran reached the 7-Eleven parking lot, he had been asking people for rides and demanded several times that Hillary give him a ride. This evidence also falls within Rule 2:404's exception that Cochran's motive for demanding a ride was to flee from the shooting of Leigh-Gaye.

---

[6] *See Cook*, 7 Va. App. at 227-29 (finding that the defendant and his accomplice's three robberies were connected because they occurred on the same day, in close succession, and were committed using the same method).

Furthermore, an out of state expert at the Department of Forensic Science matched the bullets found at both shootings to Cochran's firearm.  The Commonwealth also would have presented overlapping witnesses in separate trials.  Hence, "[m]uch [of] the same evidence would have been submitted to the jury in separate trials." *Fincher*, 212 Va. at 553.[7]

Therefore, because the evidence is interconnected and would have been admissible in separate trials, we find that Rule 3A:10(c) is satisfied.  Moreover, the interests of justice do not require separate trials.  Accordingly, "[b]ecause the two offenses met the requirements of Rules 3A:10(c) and 3A:6(b), and justice did not require separate trials, the trial court did not abuse its discretion by refusing to sever the offenses." *Yellardy*, 38 Va. App. at 26.

II.  Fifth Amendment Right Against Self-Incrimination

Whether Officer Adkins's or the magistrate's statements[8] violated Cochran's "Fifth Amendment rights is a mixed question of law and fact." *Commonwealth v. Quarles*, 283 Va. 214, 219 (2012).  When "reviewing a trial court's denial of a motion to suppress, 'we determine whether the accused has met his burden to show that the trial court's ruling, when the evidence is viewed in the light most favorable to the Commonwealth, was reversible error.'" *Knight v. Commonwealth*, 71 Va. App. 771, 782 (2020) (quoting *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015)).  As a result, "we are 'bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them, and we give due weight to the inferences drawn from those facts by resident judges and local law-enforcement officers.'" *Myers v. Commonwealth*, 83 Va. App. 656, 664 (2025) (quoting *Cantrell*, 65 Va. App. at 56).

---

[7] *See Fincher*, 212 Va. at 552–53 (affirming that the trial court did not abuse its discretion in denying severance because the offenses arose from connected events, involved overlapping evidence, and would have required the Commonwealth to call the same out-of-state witness).

[8] On appeal, Cochran does not develop any suppression arguments for the statements he made to Officer Gonzalez-Fernandez.  Instead, he focuses entirely on statements made before the magistrate and those made to Officer Adkins while in transport.

Nonetheless, "we review *de novo* the trial court's application of defined legal standards to the particular facts of a case." *Watts v. Commonwealth*, 38 Va. App. 206, 213 (2002). "Upon taking a suspect into custody, police are required to warn him of his right to an attorney and the right to remain silent during questioning by police." *Thomas* v. *Commonwealth*, 72 Va. App. 560, 574 (2020) (quoting *Miranda v. Arizona*, 384 U.S. 436. 479 (1966)). The United States Supreme Court describes someone as in "custody" during "questioning initiated by law enforcement officers after a person has been . . . deprived of his freedom of action in any significant way."[9] *Miranda*, 384 U.S. at 444.

"When determining if an interaction between a suspect and the police constituted interrogation, the reviewing court must look outside the box of literal 'interrogation' to the larger picture." *Thomas*, 72 Va. App. at 580. "The court must examine whether police behavior involved the sort of coercion, defined as conduct that actually implicates the compulsion element of the privilege against compelled self-incrimination, that *Miranda* was designed to prevent." *Id.* at 580-81. "If the defendant indicates that he wishes to remain silent at any point prior to or during questioning, 'the interrogation must cease.'" *Id.* at 574 (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)).

However, if a suspect invokes his right to remain silent but "voluntarily reinitiates questioning or a significant amount of time passes," police may further interrogate him. *Id.* at 582. Indeed, the United States Supreme Court has made clear that "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (quoting *Miranda*, 384 U.S. at 478). That is because "the purpose behind the *Miranda* and *Edwards* decisions was preventing government officials from using the coercive nature of

---

[9] The parties agree that Cochran made incriminating statements while in police custody, both when Officer Adkins placed him in a patrol cruiser and when he later appeared before the magistrate.

- 17 -

confinement to extract confessions that would not be given in an unrestrained environment." *Thomas*, 72 Va. App. at 581.  Accordingly, not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Innis*, 446 U.S. at 299.  Rather, "[i]t must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 303.

"Whereas straightforward interrogation can be easily identified, there is also ambiguous police behavior that may or may not be deemed the functional equivalent of interrogation." *Thomas*, 72 Va. App. at 580.  According to the United States Supreme Court, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301.

The Court emphasized that it "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," thereby "vest[ing] a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id.*  However, police officers "cannot be held accountable for the unforeseeable results of their words or actions." *Id.* at 301-02.  As a result, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 302 (emphasis omitted).

Here, when reviewing the facts in the light most favorable to the Commonwealth, Officer Adkins's remarks to Cochran were neither confrontational nor the functional equivalent of interrogation and thus were not likely to elicit a self-incriminating response from him.  As the

trial court found, Officer Adkins was "startled" by Cochran flirting with her when he asked her to rate him on a scale from one to ten, given that he had just been arrested for murder and severely injuring another person. In this context, her remark that "you just murdered someone" was not the product of interrogation because after her statement, she slammed the patrol cruiser shut and did not ask any follow up questions. As a result, Cochran's incriminating response was not reasonably foreseeable because her statement was not likely to elicit an incriminating response.

Focusing "primarily upon the perceptions of the suspect," *Innis*, 446 U.S. at 301, Officer Adkins's comment that Cochran was "going to the big jail" and "should find a friend there" also does not constitute an interrogation. Officer Adkins's remarks were in response to Cochran's question about where he was heading as well as his own voluntary statements about being lonely and needing a friend. Additionally, these statements were not likely to elicit a self-incriminating response because Cochran, who continued to rap about the offenses and boast about his actions, clearly did not interpret them as confrontational interrogation.

When Cochran heard Officer Adkins's statements, he responded by talking about having his own jail cell due to COVID-19 restrictions. Hence, his response further demonstrates that the remarks were not of the type officers should have known were likely to elicit an incriminating response. Because Officer Adkins simply answered his questions without asking any follow up questions, and Cochran did not interpret those remarks as interrogative questioning, those statements do not constitute interrogation within the meaning of the Fifth Amendment.

Similarly, Officer Adkins's statement to Cochran that "I think you're figuring out where you're gonna be for a while," was in reference to his voluntary statements about how he would fit in with his fellow prisoners. Like her previous statements, she did not ask him any questions related to his arrest and did not further pursue questioning after he made incriminating statements

- 19 -

that he "had two murders on [him] now." Thus, her remark did not constitute interrogation within the meaning of the Fifth Amendment.

During the nearly hour-long car ride, Officer Adkins made only brief remarks to Cochran, did not question him, and told him that she could not hear much of what he was saying. Officer Laitinen made no remarks to Cochran and did not respond to any of his questions. Therefore, "[g]iven the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that [Cochran] would so respond." *Innis*, 446 U.S. at 303. Furthermore, Cochran "was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." *Arizona v. Mauro*, 481 U.S. 520, 529 (1987). Accordingly, we find that Cochran "was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." *Innis*, 446 U.S. at 303.

As for Cochran's incriminating statements to the magistrate, we also find that these statements were voluntarily made outside the context of a custodial interrogation and thus did not violate his *Miranda* rights.[10] When the magistrate told Cochran that "she could hear from him if there was anything that he would want to say, [but] he didn't have to say anything," that was not a question reasonably likely to elicit an incriminating response. That is because the Fifth Amendment only protects against compelled incrimination and so "[a]bsent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning

___

[10] In its brief, the Commonwealth argues that *Miranda* applies only to law enforcement officers and that, because a magistrate is a judicial officer under Code § 19.2-56.2(A), *Miranda* does not apply to magistrates. However, under the best and narrowest grounds doctrine, we do not need to rule on that argument. *See Butcher v. Commonwealth*, 298 Va. 392, 397 (2020) (holding that under the best and narrowest grounds doctrine, "a degree of judicial caution should accompany any holding that reaches out beyond the limits of the particular case to address unnecessary and novel issues").

admissions." *United States v. Washington*, 431 U.S. 181, 187 (1977). Hence, "[a] question that is not likely to elicit an incriminating response is not inherently coercive and therefore should not trigger the protections of *Miranda*." *United States v. Bogle*, 114 F.3d 1271, 1275 (1997).

Although Cochran contends that appearing before a magistrate under oath and without counsel created the "impression" that his statements would not be used against him, the magistrate's statement did not constitute interrogation under the Fifth Amendment. Here, "the evidence is clear that [Cochran] was not asked any questions by the police; he was asked by the magistrate if he wanted to say anything" during the hearing. *United States v. Harris*, No. 3.08-CR-365, 2009 U.S. Dist. LEXIS 464, at *9 (E.D. Va. Jan. 6, 2009).[11] Rather, viewing the facts in the light most favorable to the Commonwealth, we find the magistrate's statement was general in nature, did not refer to Cochran's alleged crimes, was unlikely to elicit incriminating information, and was commonly stated when a defendant appears before a magistrate.[12]

Therefore, "[s]ince [Cochran] was not in the inherently compulsive atmosphere of custodial interrogation, the incriminatory nature of his response does not mean that it must be excluded merely because it was not preceded by *Miranda* warnings." *Schmidt v. State*, 481 A.2d

---

[11] Unpublished federal decisions are not binding on Virginia courts. *See Owsley v. Peyton*, 352 F.2d 804, 805 (4th Cir. 1965) ("Though state courts may for policy reasons follow the decisions of the Court of Appeals whose circuit includes their state, they are not obliged to do so." (citation omitted)). *See also Harris*, 2009 U.S. Dist. LEXIS 464, at *9 (holding that general questions asked by a magistrate, such as whether the defendant had anything he wished to say, were not intended to elicit incriminating information and did not constitute an interrogation even though the defendant's response was incriminating).

[12] *See Commonwealth v. Wease*, 46 Va. Cir. 61, 62 (Loudoun Cir. Ct. 1998) (finding that a magistrate's question violated the defendant's Fifth Amendment rights because it was not "the type of question normally attendant to arrest and custody," but instead "was specific to the offense, potentially incriminating, and not universally applicable to all bond determinations").

241, 248 (Md. Ct. Spec. App. 1984).[13] Instead, "[t]hose warnings were designed to guard against compelled, not voluntary self-incrimination." *Id.* Accordingly, "[u]nder the circumstances, it appears that this question was not asked by the magistrate in order to elicit incriminating information from [Cochran], even though the answer was incriminating. For this reason, there was no custodial interrogation triggering *Miranda*." *Harris*, 2009 U.S. Dist. LEXIS 464, at *9. Thus, viewing the facts and all reasonable inferences in the light most favorable to the Commonwealth, we conclude that Cochran's statements to Officer Adkins and the magistrate did not result from custodial interrogation and therefore did not violate *Miranda*.

### III. Motion to Exclude the 911 Call

Cochran argues that the 911 call by Leigh-Gaye as he was dying is needlessly cumulative and that its inclusion as evidence introduced unfair prejudice to Cochran. We address each of these claims in turn.

"Given the 'broad discretion' of a trial judge over evidentiary matters, we apply a deferential abuse-of-discretion standard of appellate review." *Tynes*, 49 Va. App. at 21 (quoting *Seaton v. Commonwealth*, 42 Va. App. 739, 752 (2004)). "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of Virginia, statute, Rules of the Supreme Court of Virginia, or other evidentiary principles." Va. R. Evid. 2:402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "Generally, a litigant is entitled to introduce all competent, material, and relevant evidence that

---

[13]Although we have never addressed whether appearing before a magistrate may constitute an interrogation under the Fifth Amendment, other jurisdictions have considered the issue, and we find their reasoning persuasive. *See Schmidt*, 481 A.2d at 248-49 (holding "that questions about matters relevant to bail, asked of an accused by a judge, in a courtroom, do not constitute a 'custodial interrogation' requiring that the accused be warned or advised of his *Miranda* rights in order that his responses may be admitted into evidence over his objection").

tends to prove or disprove any material issue in the case, unless that evidence violates a specific rule of admissibility." *Barkely v. Wallace*, 267 Va. 369, 373 (2004). "'Evidence is material if it relates to a matter properly at issue' in the case." *Cousins v. Commonwealth*, 56 Va. App. 257, 271 (2010) (quoting *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 196 (1987)).

"Relevant evidence may be excluded if . . . the evidence is needlessly cumulative." Va. R. Evid. 2:403(b). "We do 'not . . . look at the effect to be produced' by evidence when considering whether it is cumulative, but rather to the 'kind and character of the facts.'" *Commonwealth v. Proffitt*, 292 Va. 626, 640 (2016) (alteration in original) (emphasis omitted) (quoting *St. John v. Alderson*, 73 Va. (32 Gratt.) 140, 143 (1879)). "Indeed, '[t]he facts may tend to prove the same proposition, and yet be so dissimilar in kind as to afford no preten[s]e for saying they are cumulative.'" *Id.* (alterations in original) (emphasis omitted).(quoting *St. John*, 73 Va. at 143). "If it is dissimilar in kind, it is not cumulative, in a legal sense, though it tends to prove the same proposition." *Haas v. Commonwealth*, 74 Va. App. 586, 628 (2022) (quoting *Wynne v. Newman*, 75 Va. 811, 817 (1881)) (explaining that testimony and affidavits are sufficiently different in kind so as not to be cumulative).

According to Cochran, "those things that gave [the 911 call] relevance were more than covered by other evidence in the case." He contends that what gives the call relevance is that it establishes "the time of the call, the Shell station and the CVS, and the fact that [Leigh-Gaye] had been shot." Yet, "those things are more than covered . . . In fact, we would stipulate to them." The other evidence supporting those facts is eyewitness testimony.

In contrast, the Commonwealth argues on brief that "Leigh-Gaye provided information about his location after being shot and demonstrated that he did not perish immediately, such that the jury could infer he remained alive when Cochran returned and took items, including his cell phone from him." According to one witness, while Leigh-Gaye may have been alive for some time

after he was shot, he "was gone" right before Cochran "came back and . . . removed the shoes, the wallet, and the phone." The trial court denied the motion to exclude the 911 call saying, "it does appear to be relevant because . . . it dovetails perhaps with other alleged eyewitness testimony, if there is such witness testimony presented." The trial court also concluded that the call is "identifying location" throughout.

Not only does the 911 call serve as evidence for different propositions than the witness testimony, but it was also sufficiently dissimilar in kind to warrant inclusion as evidence. Leigh-Gaye's location was established by witness testimony and corroborated by the 911 call. However, his phone call indicated that he was alive for at least some time after he was shot. To the Commonwealth's point, there is no medical evidence in the record indicating when exactly Leigh-Gaye died, and he was not pronounced dead until after he was transported to the hospital at 7:04 p.m. Thus, a jury may infer that he was alive when Cochran came back to take his things. Even if this were not the case, the 911 call is sufficiently different in kind from testimonial evidence that it is not cumulative.

We now address the probative value of the evidence. "Relevant evidence may be excluded if . . . the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. R. Evid. 2:403(a). "[W]hen relevant evidence is offered which may be inflammatory . . . , its relevancy 'must be weighed against the tendency of the offered evidence to produce passion and prejudice out of proportion to its probative value.'" *Cousins*, 56 Va. App. at 271-72 (alterations in original) (quoting *Coe v. Commonwealth*, 231 Va. 83, 87 (1986)). "The fact that evidence is highly prejudicial to a party's claim or defense, in and of itself, 'is not a proper consideration in applying the balancing test.'" *Conley v. Commonwealth*, 74 Va. App. 658, 673 (2022) (quoting *Fields v. Commonwealth*, 73 Va. App. 652, 672 (2021)).

- 24 -

"[T]he circuit court must determine whether the probative value of the evidence is substantially outweighed by its unfair or unduly prejudicial effects." *Fields*, 73 Va. App. at 672 (emphasis omitted). "To be excluded as unfairly prejudicial, 'the nature of the evidence must be such that it generates such a strong *emotional* response that it is unlikely that the jury could make a *rational* evaluation of its proper evidentiary weight.'" *Conley*, 74 Va. App. at 673 (quoting *Fields*, 73 Va. App. at 672).

The trial court did not abuse its discretion in admitting the 911 call recording. There is no evidence here that introduction of the 911 call inflamed the passions of the jury members so much that it undermined their ability to make a rational evaluation of its proper evidentiary weight. *See id.* The call was relevant to material issues at trial—namely, that Leigh-Gaye was still alive when Cochran took his effects, which was necessary to support the robbery charge—and it corroborated witness testimony. Just as the Commonwealth was permitted to introduce video and photographic evidence to establish the time, location, and activities of Cochran and his victims, it was permitted to introduce the 911 call to support these same facts as well as the length of time between the shooting of Leigh-Gaye and his death. Unlike the 911 call, "[c]ommon examples of [unfairly prejudicial] evidence are particularly graphic crime scene or autopsy photos, which are inherently unfairly prejudicial because their shock effect prevents a layperson on a jury from being able to properly evaluate or weigh them in the context of other evidence." *Fields*, 73 Va. App. at 673 (emphasis omitted). The 911 call may have highlighted the gravity of Cochran's actions, but we have no evidence that it impaired the rational decision-making of the jury members. For the foregoing reasons, Cochran's arguments supporting the exclusion of the 911 call fail.

IV. Sufficiency of the Evidence for Malice

Cochran argues that the trial court erred by overruling his motion to strike the first-degree murder charge because there was insufficient evidence to show malice. The argument rests on the claim that Cochran acted under the heat of passion because of provocation by Leigh-Gaye.[14]

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Smith v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018)). "We review the sufficiency of the evidence in the light most favorable to the Commonwealth." *Farhoumand v. Commonwealth*, 288 Va. 338, 351 (2014). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "[I]f there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 224 (2013)). "Rather, the relevant question is . . . whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Secret*, 296 Va. at 228 (quoting *Pijor*, 294 Va. at 512).

---

[14] At trial and in statements to police, Cochran also asserted self-defense as a basis for reducing the crime from murder to manslaughter. In closing argument, counsel for Cochran argued, "That's either self-defense or absence of malice. That's for you to decide. It is our position that it's self-defense. He had just gone through that beating and he was coming back at him again." However, Cochran does not develop this argument on brief. "The opening brief of appellant must contain . . . [t]he standard of review and the argument (including principles of law and authorities) relating to each assignment of error." Rule 5A:20. "Unsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)).

"Murder, other than aggravated murder . . . by any willful, deliberate, and premeditated killing . . . is murder of the first degree." Code § 18.2-32. "Malice, an essential element of all grades of murder, distinguishes murder from manslaughter." *Rhodes v. Commonwealth*, 238 Va. 480, 485 (1989) (quoting *Moxley v. Commonwealth*, 195 Va. 151, 157 (1953)). "Malice inheres in the doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will . . . Its existence is a question of fact to be determined by a jury under proper instructions." *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947).

"Circumstantial evidence, if sufficiently convincing, is as competent and entitled to the same weight as direct testimony." *Lucas v. Commonwealth*, 75 Va. App. 334, 346 (2022) (quoting *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)). "This Court does not view circumstantial evidence in isolation." *Id.* at 346-47. "Rather, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" *Id.* at 347 (quoting *Karnes v. Commonwealth*, 125 Va. 758, 764 (1919)).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender." *Fary v. Commonwealth*, 77 Va. App. 331, 342 (2023) (en banc) (quoting *Secret*, 296 Va. at 228-29), *aff'd*, 303 Va. 1 (2024). Indeed, "[i]ntent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). A trier of fact may use circumstantial evidence to determine intent "provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

"'Heat of passion' refers to the *furor brevis* which renders a man deaf to the voice of reason." *Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998) (quoting *Hannah v. Commonwealth*, 153 Va. 863, 870 (1929)). "In order to show that a killing occurred in the heat of passion, the evidence must prove the simultaneous occurrence of both 'reasonable provocation' and 'passion.'" *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997). "'As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice arising from a homicide is a question of fact' to be decided by the jury." *Dandridge v. Commonwealth*, 72 Va. App. 669, 682 (2021) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131-32 (2016)).

Here, we must affirm the trial court's decision unless no rational trier of fact could have found beyond a reasonable doubt that Cochran committed first-degree murder. Since Cochran does not dispute sufficiency for the other elements of the crime, including that he shot Leigh-Gaye, we focus on the malice element alone.

The evidence in the light most favorable to the Commonwealth shows that Cochran and Leigh-Gaye had an altercation, Leigh-Gaye walked away, Cochran followed him, Cochran shot Leigh-Gaye, and Leigh-Gaye died from the shooting. Eyewitness testimony indicates that Cochran and Leigh-Gaye were "screaming at each other" and "pushing" each other "[i]n the middle of the street." Subsequently, Leigh-Gaye took hold of Cochran and reached for his gun. Leigh-Gaye grabbed Cochran and slammed his head repeatedly against a metal bench under a bus stop pavilion. Cochran yelled for him to stop multiple times.

After this, however, Leigh-Gaye walked out of the pavilion and away from the bus stop. At that point Cochran got up, grabbed his gun, and walked toward Leigh-Gaye. With his gun out, Cochran then told Leigh-Gaye to give him the red shoes he was wearing. Leigh-Gaye refused, saying "I don't fear you, I only fear God." Cochran testified that Leigh-Gaye then

charged at him. However, witness testimony says Cochran "walked out and pointed his gun" at Leigh-Gaye "right after" Leigh-Gaye had left the pavilion and that Leigh-Gaye turned around and walked toward Cochran only "because [Cochran] had the gun up" at Leigh-Gaye. As Cochran pointed his gun, Leigh-Gaye said, "What are you going to do shot [sic] me? Go for it." Cochran then shot him.

Several features of these events work against the "heat of passion" defense. Though Cochran says he felt he was in a "flight or fight situation," he grabbed his gun and walked *toward* Leigh-Gaye while Leigh-Gaye was walking *away* from the pavilion. After the shooting, Cochran returned to Leigh-Gaye on the ground and took the shoes from his feet along with his wallet and cell phone. Cochran did not call 911, but instead called his friend Daxtyn Tran to see if he could get a ride.

Cochran's actions throughout the initial altercation, the shooting, and the attempt to get a ride home all demonstrate his intent to obtain the red shoes from Leigh-Gaye. Cochran and Leigh-Gaye initially "became more confrontational" and were "arguing over [Cochran's] shoes" because Leigh-Gaye refused to take them off and give them to Cochran. Cochran again asked for the shoes right before shooting Leigh-Gaye. He removed the shoes from Leigh-Gaye after the shooting. Finally, two other witnesses said they saw Cochran carrying the red shoes later at the 7-Eleven.

In addition to these facts, a number of Cochran's statements indicate his intention and state of mind during the shooting. He said, "I prayed before I killed this [n-word], I prayed during I killed this [n-word], I prayed after I killed this [n-word]." In Officer Laitinen's vehicle he said, "I've been geeking to click that joint all day and I finally killed somebody. These are my first two bodies, y'all. I didn't wanna do it." Also, in Officer Laitinen's vehicle he said, "I got two murders on me now, basically, bro. I'm just waiting for another [n-word] to die. For

what?  To say I'm hard . . . ?"  In Officer Gonzalez-Fernandez's vehicle he said, "I had to shoot my man in the heart because he tried to take my gun from me, bruh."  Finally, when Cochran returned to Leigh-Gaye after the shooting, he said to him, "I told you I was going to do it."  Describing the shooting incident, Cochran explained, "He was showing signs of no fear, bruh.  I told him I was gonna strike him, [n-word], so I striked him."

In light of all these facts, we cannot say that no rational trier of fact could conclude that Cochran was "deaf to the voice of reason" produced by the furor brevis of heat of passion.  *See Caudill*, 27 Va. App. at 85.  Even if we were to determine that the altercation between Cochran and Leigh-Gaye reasonably provoked Cochran to shoot, Cochran's actions and words surrounding the shooting provide enough basis for a rational person to conclude that he was not, in fact, under heat of passion when he discharged his weapon.  Regardless of whether we believed the evidence was sufficient to cast reasonable doubt on the malice element of first-degree murder, we are "not permitted to substitute [our] judgment" in place of the "conclusions reached by the finder of fact at the trial." *Linnon*, 287 Va. at 98.  Thus, Cochran's argument that the evidence was insufficient to find malice is without merit.

## V.  Motion for Mistrial Based on Jury Prejudice

Cochran contends that the trial court erred by denying his motion for a mistrial after the local media published a video of his transport to the Fairfax jail.  According to Cochran, even if the trial court was required to release the video, it should have waited to allow Cochran to "research the issue."  Cochran continues by asserting that because of the release, the jury was prejudiced.  Cochran points to at least one juror failing to respond to the trial court's question of whether the jury had followed instructions not to expose themselves to any news stories about the case.  He argues that the news stories "became increasingly derogatory toward [Cochran] with each passing evening"

and a "news reporter mischaracterized the defense theory of the case and presented character evidence of [Leigh-Gaye]."

"Under settled principles of appellate review, 'the party moving for a mistrial . . . has the burden of establishing a manifest probability of prejudice.'" *Bennett v. Commonwealth*, 84 Va. App. 607, 624 (2025) (quoting *Brown v. Commonwealth*, 64 Va. App. 59, 67 (2014)). "The appellate court reviews the denial of a motion for a mistrial under an abuse-of-discretion standard." *Id.* "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Bista v. Commonwealth*, 303 Va. 354, 370 (2024)). "Under this standard, when a trial court 'has a range of choice,' the appellate court will not disturb its decision 'as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* (quoting *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563-64 (2016)) (finding a trial court's decision to issue an "*Allen* charge" to a non-unanimous jury was not an abuse of discretion).

"The circuit court clerks shall have custody of and shall keep all court records, including . . . evidence . . . deposited in their offices or at such location otherwise designated by the clerk." Code § 17.1-242. "[A]ny records that are maintained by the clerks of the circuit courts shall be open to inspection in the office of the clerk by any person and the clerk shall, when requested, furnish copies thereof subject to any reasonable fee charged by the clerk." Code § 17.1-208(B). "Except as otherwise provided by law, the requested court records . . . shall be provided to the requester within a reasonable period of time . . . but in no event longer than 30 days from the date of a complete request." Code § 17.1-208(F).

"Construing the language of the statute as it has endured for more than a century, we conclude that the General Assembly intended to recognize the generally accepted common-law rule of openness." *Shenandoah Pub. House, Inc. v. Fanning*, 235 Va. 253, 258 (1988). "The broad sweep of this language is significant. It makes no distinction between criminal and civil

- 31 -

proceedings." *Id.* "[T]o overcome that presumption [of openness], the moving party must bear the burden of establishing an interest so compelling that it cannot be protected reasonably by some measure other than a protective order . . . and that any such order must be drafted in the manner least restrictive of the public's interest." *Id.* at 258-59.

Here, Cochran has provided no evidence of jury prejudice that would merit a mistrial and on appeal; nor can we establish that the trial court failed to stay within its statutory range of choice or was influenced by a mistake of law. *See Bennett*, 84 Va. App. at 624. Nor can we find that a "manifest probability of prejudice" was established. *See id.*

In fact, the trial court engaged counsel for Cochran in multiple lengthy exchanges about the release of the footage. After Cochran requested an extra day to research the issue, the trial court interpreted the statute saying, "And so it's a 'shall.' It's a mandate. How could it be—what argument would you have [to prevent release of the video]?" Further, the trial court explained its duty relating to the presumption of press openness as "to carry out the will of the state legislature. I do not think that this will affect a fair trial."

Cochran argued at trial that the jury would likely see the news videos but lie about whether they had seen them. However, the trial court instructed the jury before releasing them for the night, "don't watch the local news. . . . If relatives or friends approach you . . . , you're not permitted to talk to them about it. . . . [I]f something gets shown to you, just put it aside. Don't look at it. Don't be influenced by it." The trial court also warned that news could contain "false information," they must not "do violence to [their] duty as jurors," and if a report or news story comes up on TV, "don't watch it. Turn the channel." Further, the trial court specifically mentioned the possibility of mistrial if they engaged with the news, saying, "You've invested all this time. So we don't want to have a mistrial."

The next day, the trial court confirmed that the jury had followed its instructions. In the eyes of the trial court, "we revisited the issue[,] and they all nodded" that they had not done things they were instructed not to do. Cochran disagreed, claiming that "[o]ne lady did not" nod. The trial court responded, "maybe one didn't, but nobody indicated that they had [engaged with the news] when I asked," then later expressed that maybe the juror was "nodding slightly, I don't know." In any case, the trial court asked for actual evidence of prejudice, and Cochran could not offer any outside of the single juror's alleged failure to nod.

"A jury is presumed to follow the court's instructions, and an appellant who challenges a verdict bears the burden of rebutting that presumption." *Centra Health, Inc. v. Mullins*, 277 Va. 59, 81 (2009) (quoting *Stump v. Doe*, 250 Va. 57, 62 (1995)). We are bound to give abuse of discretion deference to the trial court's determination that the presumption was not overcome by sufficient evidence. *See Lawlor*, 285 Va. at 212 ("[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.") We cannot find any reason that overwhelms the deference we are required to grant the trial court. Thus, Cochran's argument to the contrary lacks merit.

CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment on all issues.

*Affirmed.*